Can I start? Go ahead. Your Honor, my name is Robert Yackes. I am representing Beijing Zhongyi in this appeal. I'd like to reserve four minutes for rebuttal. Yackes County, Indiana is perfectly fine. All right. Your Honor, I want to focus on the contract interpretation. This is a contract which is to be interpreted de novo by this court. It is an issue of law. And the issue I'd like to focus on is that the district court refused to consider any extrinsic evidence. The controlling law in Washington State, which is the law under which the contract should be interpreted, requires that the controlling case is Berg v. Hudesman. And Berg v. Hudesman, which has been followed for the last 25 years, makes it very clear that you essentially always look at extrinsic evidence to look at the party's intent at the time of contracting the contract was entered into, not to add terms or take away terms, but you have to look at it for the intent. The court in this case decided the integration clause trumped all that, but that's directly contrary to the Berg case. The Berg case says even when there's an integration clause, you still consider the extrinsic evidence. Counsel, if we agree with you on that point, I find a certain dissonance in the briefing because sometimes it seems you want us to have considered these MOUs and sometimes not. I apologize. We do want you to consider that. There was different counsel writing different briefs, and the appellate brief believes it should be considered. Okay. And so you think that we should consider both of them, the MOU and the SMOU? Yes. Okay. So if we did that, where would that get us? How does it change the terms? Because the opposing counsel is going to say the licensing agreement is very clear. So how does that change anything for us? I think it changes in two respects. One is if you look at the grant clause, and we focused on three parts of it, there's a definition, at least in the third part, which talks about the licensed products. And licensed products are defined as the products into which these funds are integrated. R is a present tense verb, and this court has, in the past, interpreted it that way. And there's an issue, at least, on whether there were any other products available at the time, but certainly there's evidence that the funds had been integrated at the time of the contract into a Microsoft 95, in which case licensed products would be limited just to the Microsoft 95. How does that work? If R is the present tense verb, and this is an agreement to basically acquire licensing privileges for those funds, it seems to me that as of the time the licensing agreement was entered into, the funds hadn't been incorporated into any Microsoft product. Have I missed something? I don't think that's correct. I don't think there was evidence one way or the other of that, but if you look at Schedule C of the agreement. But how would that even happen, counsel? They were entering into a licensing agreement, so R-A-R-E. Right. If that's construed as literally as you want us to construe it, it makes no sense to me because they hadn't agreed to use those funds anywhere. Okay. Well, the licensing agreement only says you can use the copyright here, if you will, without being sued. It doesn't mean that no work had been done. In fact, if you look at Schedule C to the agreement, Schedule C indicates that the beta testing had already been finished. Beta testing was finished on October 10th of 1995, the day of the agreement. That was November 10th, I believe. So there had been work on it already. So you think they had been integrated at least on sort of a test basis. That's your argument? Not on a test basis, but if you look at the Schedule C, the final was only November 20th, 10 days later. It was pretty far along the process at the time here. But that's, again, a fact. Those are issues here that the judge didn't consider at all. Is there any other way, apart from the argument you just raised that the word R should be taken quite literally, is there any other way that the MOU or the SMOU matters for purposes of interpreting the licensing agreement? I think so. When you look at both of them, the first MOU is about developing a single product, which was the Microsoft 95 product. That's all that was being discussed. What about Paragraph 7 of the MOU? Is that the first MOU or the second one? The future versions. No, just the MOU. Okay. Well, I think, again, it's a translation. There's different ways to read that. But the future versions, Microsoft is updated. Windows 95, for example, is updated all the time. I asked the court to take judicial notice. If you have a computer, you're always getting requests to put modifications in there. So that, by itself, doesn't mean that it was a different operating system entirely. And I will concede that this agreement is not a model of clarity. It has certain things in it which suggest it's just Microsoft 95 and certain things in it suggest that maybe there are some other versions. That's, I think, why it was improper to have dismissed this case in 12B6 motion, because none of that information was available to the court. The court didn't consider any of it. One of the things the court did say was that the MOU shouldn't be considered because they were just between the Chinese government and Microsoft, and therefore the contract didn't affect the license. But there's a couple of responses. One is the license itself has the Chinese government as a signatory, so the Chinese government was involved. Second of all, the agreement itself mentions both the MOU and the supplemental MOU, so they were relevant. And third is if you look at the supplemental MOU, our company is mentioned as one of the partners, and there is a part in the supplemental MOU which suggests what the licenses with those partners should have. So the MOUs and the supplemental MOUs are relevant to the determination of what this contract means and should mean. You had one other issue that you raised in your briefs with us that you didn't raise in the district court, which is in your brief with us you asked, you said the district court should have granted leave to amend. Right. To state a reformation claim. Right. I prefer not to argue that. Now we're not pursuing that. So that's not something you're interested in? No. And Nora, just to keep the court up to date, I believe last month there was a retrial in Beijing, so we're not arguing about the finality anymore either. That decision hasn't come out. It has been tried? It has been tried. A new trial? Yes. In Beijing. Okay. But that's. So your argument here is that the district court erred in not utilizing the MOU and the SMOU as extrinsic evidence in interpreting some ambiguous terms in the agreement. Yes. And in addition, there may indeed have been more extrinsic evidence too that should have been allowed. It's just the court was obligated to consider extrinsic evidence, including the MOU and the SMOU. But what's ambiguous about a perpetual license for each Microsoft product? Well, which. What's ambiguous about the licensing agreement? And are you referring now to Section 2.1? Let's see if I have in my notes where I took that from. I think it's the license grant 2.1. I didn't write down which paragraph it's from. Okay. Well, 2.1 says, as of the effective date vendor grants to Microsoft a perpetual, non-exclusive worldwide irrevocable license to, and then it lists three things. So. Yeah, use, modify, translate, and create derivative works based upon the fonts in object and source code form. Correct. Reproduce, distribute. It goes on. I mean, it's pretty broad. It is broad. Your Honors, I would suggest to you that if you look at the third element there, which refers to the licensed product as being a limitation of where those rights are. You mean sub-licensed to third parties? No. But that says any licensed product. It doesn't say the licensed product. It says any licensed product. Any licensed product. Well, we suggest to you that licensed product is the Microsoft 95 because it's. What's your strongest argument that licensed product is limited to Office 95? Because it's defined as the products into which the fonts are integrated. Are. That's your strongest argument is the present tense are argument? Okay. And we believe that also that that limitation about the licensed product really should be modifying the first and second sub-parts because if it essentially, and you read this in a vacuum, this would be a licensed grant to Microsoft that they can do anything they want with the font, not just limited to putting it into an operating system. They could go into the business and sell their own fonts. And that wasn't contemplated at all. So the parties, at least I believe, agree that this is an agreement that's contemplated for use of the font in some product. The only suggestion of which part that would be is a licensed product. And the licensed product, we believe there's evidence in there that's limited to the Microsoft 95 product. But again, at the very least, it's an issue that should have been decided and it wasn't looked at at all. Okay. Did you want to say the rest of your time for rebuttal? Yes. Okay. Thank you. Good morning, Your Honors. Good morning. I'm Steve Rumage and I'm appearing this morning on behalf of Microsoft Corporation. And frankly, Mr. Yackes just took off the table some of the issues that I plan to talk about this morning. So I'm going to focus on the contract construction issue and talk about the fact that the district court did properly construe the font license under Washington law. It's an unqualified perpetual license for these specific Chinese fonts. Can I get you to back up first before we get to that and just address, if you would, the integration clause, the judge's interpretation of the integration clause and the extrinsic evidence, just as a legal matter before you get to that. Sure. If you want me to go to the law first, absolutely. I'm happy to start there. And I would first start with this, just in terms of the background, because Mr. Yackes referred to the Berg versus Hudesman case, which is the case that Washington Supreme Court decided roughly 1990. That was a sea change in Washington contract law, but it was a sea change that was then clarified and qualified in Hearst Communications versus Seattle Times. And the significance of that change is that Berg versus Hudesman essentially changed the old rule that you just couldn't look at extrinsic evidence, period, unless you first found an ambiguity. And so for those of us who were practicing in 1990, it seemed like the doors just came wide open. And then a little over 10 years later, the court decides Hearst Communications versus Seattle Times, a case that frankly I handled. And in that case, what the court did was clarify that Berg versus Hudesman didn't just throw open the doors. And what it says is, and I think it's very important in the context of this case, is it says, first of all, this is at 154 Washington second at 503. It talks about the fact that you can use extrinsic evidence. And so any more, it's not a question of can the court look at extrinsic evidence. It can. The question is, what can you do with it once you look at it? And so what the court said is you cannot use extrinsic evidence to, quote, show an intention independent of the instrument or to very contradict or modify the written word. Okay, what can you use it for? You can use it to determine the meaning of specific words and terms used. And so, for example, if, if the contract uses the term possession date, you know, you get possession of the property on the possession date. It doesn't define what that is. You can look at extrinsic evidence to see what those words mean. Even when there's an integration clause. Exactly. Your honor. That's exactly right. That's what the district court didn't do though. Well, but, but here I, well, there's an integration clause here. So, you know, well, I'm not sure I quite agree with you. You can't rely on extrinsic evidence here. I'm not sure I quite agree with you, your honor. And the reason I say that is because she did look at the extrinsic evidence, right? She, she didn't say I strike the MOU and the supplemental MOU. She looked at it. She discussed it. But what she found was that there was no ambiguity in, in any of the language in the license grant. And, and that's significant. And the reason that's significant is because, as I said, a moment ago in the Washington Supreme Court's decision in Hearst says you have to use extrinsic evidence, if at all, to determine the meaning of specific words and terms used. And it was interesting that when you heard Mr. Yackes a moment ago, when he was asked, what's your best argument, his best argument was that licensed products is in the defined in the presence tense. And so you need to look at the extrinsic evidence to see what that means. But remember, that is only clause three of the license grant. Clause one, and Judge Pius, I believe that you alluded to this. When you look at clause one, clause one says that you may use the fonts in object in source code form without limitation. And indeed clause one says you may create derivative works based on the fonts, create derivative works based on the fonts. So that's not just talking in the present tense about fonts that already pardon me, works that already exist. It's saying going forward, I can create works based on the fonts. It also says you can sell copies of the fonts and says you may sell derivative works based on the fonts as well. So leave aside Mr. Yackes best argument, which is the definition of licensed products, throw out subsection three of the license grant, like subsections one and two, clearly give Microsoft exactly what the district court found. How do the recitals fit into the terms of the agreement itself? Because there was one, the last recital says something about to be used for Microsoft Windows 95 PRC version or any other Microsoft product. Exactly right, Your Honor. So how do those recitals fit in? So there's two questions there it seems to me. One is the question, what does Washington law generally say about recitals? Then the second question is, what about these recitals here? So for Washington law, generally recitals are considered extrinsic evidence because they're simply recitals of facts. So if, if there is, if extrinsic evidence is appropriately used to clarify the meaning of a word used in an agreement, you may look to the recital. And indeed there are cases that the plaintiffs cite in their brief where that is done. No problem with those. I don't think that's the case here because I don't think if one looks at subsection one and two of the license grant in section 2.1 of the contract, I don't think there's any word that is difficult to understand in there that is qualified, that is ambiguous. Now, having said that, if Your Honor thought that I was wrong and thought that one needed to go to the recitals to look to evidence, that recital clearly says it's not limited to Windows 95. There's only, it's funny, in the brief and in Mr. Yaka's argument a moment ago, the claim is that this license agreement is limited to Windows 95. And yet when you read the agreement, there are two places where those words appear. And the two places are in the first recital and in the last recital. The first recital simply says, you know, Microsoft in developing Windows 95 entered into an agreement with the Chinese Ministry of the Electronics Industry, M-E-I. Nothing more than background. The last recital says, as Your Honor just said, that Microsoft desires to license fonts to be used for Microsoft Windows 95 PRC version or any other Microsoft product. Any other. So that tells you that the claim that they're making, that the words of the license grant are limited to Windows 95, is simply wrong. Even if one goes to that extrinsic evidence. And I would add that even if one goes to the MOUs, I thought it was an interesting response to, I believe it was Your Honor's question about what does it change if we look at the MOU and the supplemental MOU. And again, what I didn't hear was what is the word in the license grant whose meaning is altered or clarified by that. I didn't hear that. By the MOU or the SMOU. Exactly. I didn't hear any explanation of that. And yet Hearst Communications says that's the only thing that you can use extrinsic evidence for. And I would note that even if, even if, again, I'm wrong, and we have to go to the supplemental MOU, one of the interesting aspects of the supplemental MOU is, in addition to the fact that it has a delivery schedule, as Mr. Yock has pointed out, that is in Appendix C to the agreement, that has a delivery schedule, pardon me, that's the license agreement itself. To me, the most interesting thing about the supplemental MOU is that it has the standard terms of input method editor license agreements. That's at page 13 of docket 29. The excerpts of record are indexed by docket number. And what that says is that the agreement shall include a license for Microsoft to use the relevant technology in all Microsoft products designated by Microsoft. Again, nothing to suggest a limitation. So every piece of evidence, even if one goes to extrinsic evidence, leads back to the words of the license grant being given their ordinary usual meaning, which is what the district court did. But I don't think you've answered my question. Okay, I'm sorry, Your Honor. That's all right, because we've taken you afield. But I want to get back to the question I think Judge Pius and I both were trying to ask you, counsel, on page 10 of the court's order. Maybe you can grab that. The judge wrote, Zhangi argues that the urges the court to consider the MOUs as extrinsic evidence of the party's intentions. She said the 1995 agreement, however, contains an integration clause that bars consideration of the MOUs. Then she cites the clause. Then it said, even apart from the integration clause, the MOUs cannot aid the understanding, sorry, cannot aid in the understanding of the scope of the license for the simple fact that opposing counsel's client wasn't a party to the MOUs. So the question really is, did she look at the integration clause and then decide she couldn't consider the MOUs or not? Well, I would say that the second sentence that Your Honor just read shows that she did look at them. Well, to the effect that she looked to see who signed them. Well, no, but she also talked about what's the legal effect, because essentially what she's saying is, if I'm wrong, and the integration clause allows me to look at extrinsic evidence, notwithstanding the existence of the integration clause, and I'm looking for something probative of the party's intent, the MOUs don't help me because Zhongyi is not party. Well, his response a minute ago was that the licensing agreement does refer to the earlier MOUs, and to that extent they were incorporated. You heard him. So what's your response to that? My response to that particular point, Your Honor, is that the MOUs are referred to, I believe, in the recitals, not in the actual agreement. Why isn't that good enough? That's his argument. Because that's extrinsic. It's extrinsic to the agreement. Now, again, I get back to this. Isn't your stronger argument that you think they don't matter? Pardon me? Isn't your stronger argument that you think they don't matter? I was just going to say, that's what I get back to, is that the reality is this is de novo review. And so if Your Honors look at this and say, you know, we think we ought to pay a little bit more attention than Judge Peckman did to the extrinsic evidence, I've got no problem with that, if you want to know the truth. Because, as I said, when you look at this supplemental memorandum, it contemplates clearly a license agreement that goes beyond Windows 95, and that even if you look and give all the consideration all day long to the extrinsic evidence, it doesn't change the meaning of the words of the license agreement 2.1. Does the license agreement mention Windows 95? The license agreement, as I said a moment ago, mentions it two places. First recital and last recital. Oh, you know, I'm sorry. I'm not asking the correct question. Okay, I'm sorry. I didn't finish, and it's my fault. Okay. There's a subtext. This is what I'm trying to get at. There's a subtext that these documents may have not all been executed in English or in Chinese, so that issue. So what I'm talking about, if I could read Chinese, would I have a reason for concern that the other version, the Chinese version of this agreement, somehow differed? No. And the reason why is there is no Chinese version of the license agreement. You have the only version. So that subtext, what is that? I don't know what the subtext is there. I mean, when you say, if I could read Chinese, there is no Chinese version of this agreement. But isn't there a suggestion in the briefing that there's a? No. There is a Chinese version of the MOU. There is a Chinese version of the supplemental MOU, and each of those two agreements talks about the fact that the agreements are executed both in Chinese and English. And I cannot recall right now, because it doesn't matter, which one takes precedence for the MOUs, but there's only one version of the font license agreement. The licensing agreement was only executed in English. Correct. Correct, Your Honor. Great. All right. Thank you. And I think that's significant because that takes away a lot of these arguments. And frankly, they were atmospheric arguments. Was there ever an agreement as to a translation? There is no translation. It's an English agreement. And that's the part that I think might be misstated at one place in the briefing. But you've clarified it, and opposing counsel have an opportunity. Yeah, absolutely. But I don't think that's in any doubt. To my mind, Your Honor, I mean, one of the important things to bear in mind, since we started off with the law, I figure maybe I'll go back and finish with the law, because really what they're trying to do is take an unqualified license grant, which I think everybody agrees, even Mr. Yokas agrees, on its face is absolutely unqualified. Universal all around the country. Pardon me, all around the world. It is perpetual. It is irrevocable. And it is extremely broad. And what they're trying to do is import a limitation into it. And when you look at the Hearst case, Hearst Communications versus Seattle Times, very similar thing happening there. There's a very complex dispute over the computation of the losses under a particular agreement. And Hearst Communications argued that that referred to only certain types of losses and not other types of losses, right? Trying to limit a broad term in the contract. And the Washington Supreme Court lists in footnote 14 of its opinion about ten pieces of extrinsic evidence that are offered by the proponent there. And what they say at the end of the day is, none of this evidence changes the meaning of the words used. And so even though we look at it, we cannot change the meaning of the words used. And in the conclusion, the court actually sort of expresses regret that it can't import these limitations. And then it says, and these I think are telling words, our duty is clear, and that is to construe the words of the agreement the parties actually reached. And that's all we're asking for today. We're asking for a broad license grant to be enforced as it was written so that Microsoft gets the full benefit of the product for which it paid a million dollars. If Zhongyi wants to get more money out of that, it is not an exclusive license. They are perfectly free to shop it wherever they want. But we bargained for something, and we believe that the district court gave us what we bargained for. And so we ask that Your Honors affirm the judgment below. I'm happy to respond to any more questions. I don't know that I've ever finished an argument early before in my life.  You'll set a record. Thank you, Your Honors. Thank you. There's a bit of time for rebuttal. Counsel, could you address the translation question that I had? Do you disagree? Maybe that's the quickest way. Do you disagree with what opposing counsel just represented about what was and was not executed in Chinese? Yeah, there's only an English version of the license. I think what was referred to is there was two versions of the MOU, and there is evidence in the record if you look at page 128, which is from the transcript. And this is what Microsoft represented to the Chinese court. And I'm reading from page 128, which is page 3 of the transcript of the Beijing First Intermediate People's Court. The English version has an even clearer statement indicating that it can be used in all Microsoft products. In other words, Microsoft's own counsel represented that the English translation wasn't really the same as the Chinese. It was clearer. Right, clearer. And so that's referring to that exact part of the MOU that Mr. Romich referred to, giving Microsoft the ability to use it in any product it wants. But it is the MOU. There's an issue. But it is the MOU, not the licensing agreement. The MOU, not the licensing agreement. Correct. And the other thing I'd like to clear up is, no, I don't agree with Mr. Romich that the contract is perfectly clear. No, no, no, my question had to do with the Chinese translation. There's a separate issue. There's a second. A couple of things I want to address. One is, first a question, with the laws in Washington, with Berg, and even I think with Hearst and other cases, is you don't even need an ambiguity. That's not a prerequisite requirement. So this idea about finding or not finding an ambiguity is wrong. The second thing about the recitals. Doesn't it have to be some reason? It has to be a reason. It has to be some reason. It has to be a reason. It's evidence because, you know, an objective manifestation is you look at the contract, you look at the words on the contract, and you try to understand the contract from the text. Right, and understand the context of it. And that's what we're trying to set. But how do the MOUs matter? What if you went on that legal point about the integration clause and the status of Washington contract law? Just assume that, if you would, please. What's your strongest argument that the MOUs matter? The MOUs make it very clear that the agreement that was being reached, that this license was really pursuant to, was only for Microsoft 95. Now, keep in mind, there's two Microsoft 95s. Okay. If you look at the recitals, it talks about a Microsoft 95 PRC version and other products. That was only the Chinese version, which didn't exist at the time. Microsoft 95 did exist at the time. So this was talking. Well, in sort of a prototype form is what you just said earlier. No, the prototype was incorporating the fonts into the PRC. But I think there was already an English. Yes, but to the extent your argument is R-A-R-E and that that's present tense, then surely you're talking about. I'm sorry. I'm unclear. Oh. The Microsoft PRC version was after the Microsoft Windows 95 version was after the Microsoft 95 version. But you're right. We're talking about what was being integrated into it. Right. So when there's a discussion about other products, that could just as easily be referring to the non-PRC versions of Windows 95. The recital that counsel refers to, the fourth recital, is only about Windows 95 PRC. The first recital is about Windows 95 period. So there's a difference there. So it is, again. Well, as I pointed out, it goes on to say or any other Microsoft product. What does that mean? Well, I believe in the. That only means Windows 95, derivative versions of Windows 95? I believe so, Your Honor. Well, how do you reach that conclusion? Well, you reach it by looking at the context of the agreement. And when you look at the MOUs in the negotiation, they were only talking about a Windows 95. The title of the MOU, the supplemental MOU, is Chinese Windows 95 project. Well, I mean, they could have said there were any other version of Windows 95. Yeah. They could have said that. And Microsoft could have written this contract clearer so that it was clear that it was not just the current product but any follow-up. Any other product. Any other Microsoft product. Right, but in the context of it, which we're asking for the extrinsic evidence, the other products that were being talked about were not any possible operating system ad infinitum. It was just the versions of Windows 95 so that Microsoft doesn't have to come back every time it updates Windows 95 and get a new license. I believe that's the context that's being referred to. And if you look at the MOUs and the information there, for example, paragraph one of the MOU says the goal is to cooperate and deliver the Chinese version of Windows 95 to end users. It doesn't talk about any other operating system or all operating systems in the future. Paragraphs five and six. It certainly is consistent with the way that Microsoft and the Chinese had to view this. If Windows 95 was not successful, there weren't going to be any future versions of 95 or anything else. Possible, yes. I mean, that's entirely possible, but we don't know what the negotiations were. We don't know what the thoughts were, but the MOUs suggest that it was only for 95. Well, it suggests that 95 was the immediate cause for all of this. Right. But when you look at the supplemental MOU, which was more specific to the font, again the supplemental MOU is talking about fonts and input methods should be deemed approved by the ministry, and it was only referring to, again, Windows 95 as an operating system. So what we're asking for this court to do by reversing the district court is to go back and allow the extrinsic evidence to be considered. We believe the extrinsic evidence is going to show that the contract was only limited to Windows 95. Okay. Thank you, counsel. Counsel, we appreciate your arguments, and the matter is now submitted for decision.
judges: Paez, Bybee, Christen